Cases No. 22-1865, Sinova AG v. MED-EL Elektromedizinische Gerate GmbH Okay, Mr. Cernu. Good morning. May it please the Court. This is an appeal focused solely on anticipation. There's no obviousness, fallback involved. It involves the Board's failure to properly apply this Court's precedence in doing its anticipation analysis. Anticipation is, of course, a straightforward yet rigorous... Do you apply a precedence? How? Several. First of all, it's a two-step process, strict identity. First, you construe the claims. Then you apply the construed claim to the single prior art reference. Here, there was an adoption of a claim construction in the first instance in the final written decision. Then, effectively, the Court failed to meaningfully apply it to the single prior art reference. The construction was the term hydrophobic and required that the contact angle between a water droplet and the surface exceeds 90 degrees. All we're going to find in the Board's analysis... Teflon coating is hydrophobic. Your own patent says that. The prior art and our patent says that a slab of Teflon can have, and does have, and we do not dispute, has a contact angle of 90 degrees. What we're talking about is the surface of the cover element in Meyer. Where the Board found the 90 degree inherent teaching of 90 degrees that was then placed into the Meyer reference, if you look at that reference, Kenigsburg, that's the only one cited at Appendix 2425 in the Board's decision, talking about 90 degrees. If you look at Kenigsburg in detail, it talks about how contact angle is actually a unique function involving both the surface treatment, a Teflon surface treatment, but also the substrate to which it's applied. You can think about this in the context of... Again, our patent is talking about putting a hydrophobic coating on something to achieve... The answer is there's nothing in the patent about that, about it being dependent on the... A person of skill in the art recognizes, and you look to Kenigsburg for this explanation, that it's a unique function of both treatment and the substrate. You can think about putting a hydrophobic coating on, for example, we put this in our briefs, a screen door versus a glass door. You're going to get a very different contact angle with a Teflon coating on a screen door versus a glass door, and that's what we have here. The Meyer cover element... But the claims don't require any such analysis. But the Board's claim construction does. It talks about the surface, the contact angle between the water droplet with the surface exceeds 90 degrees. You have to look at the actual surface this is being applied to, and let's look at this Meyer cover element. The Meyer cover element is a porous... We called it a mesh-like cover element that you put over the top of a microphone in a hearing aid. And so there needs to be acoustic ingress and air ingress into this area. This is a mesh surface, and there's no analysis here that putting... permeable layer of, for instance, Teflon. So we don't have a slab of Teflon where a water droplet's going to have a 90-degree contact angle. We have a porous mesh-like thing that's put over the top of a microphone, and then a thin permeable layer of Teflon put on top of that. There was no analysis done whatsoever of that surface to say that that surface achieves 90 degrees. What the board did, effectively, was just say, OK, I see hydrophobic mentioned in the patent in suit. We see hydrophobic mentioned or hydrophobic coating being put on this Meyer cover element, and did sort of a word-matching game of saying, OK, I see hydrophobic both places, and then I'm just going to assume that that means that this meets 90 degrees. Again, where they found the 90 degrees was in this extrinsic Königsberg reference, and that goes out of its way to emphasize that, again, a slab of Teflon might have a 90-degree contact angle with water, but it's a unique function where you look at porosity and smoothness, roughness, and different aspects of the substrate to which you're applying it. I've never seen anything like that in the patent. The claims don't require such an inquiry. The specification doesn't suggest it. Again, the board's claim construction requires it. But no one is challenging that here, and this court's precedent suggests when we have a claim construction from the board, and no one is challenging here on this appeal, the question is, is there substantial evidence to meet that? Part of the problem is why we have this disconnect between the evidence and the claim construction is because the board only first adopted it in the final written decision. To go back to Maier, Maier makes clear that it's using the Teflon because of its hydrophobic character, right? That's one of the reasons it's using it. Right. And it presumably has a hydrophobic effect in the context of Maier. That's Maier's premise. And why is it not correct to say, therefore, that that hydrophobic effect caused by Teflon demonstrates that Teflon has a hydrophobic effect in the context, such as with respect to your patent? I would agree with you that putting the hydrophobic coating or Teflon coating on the Maier cover element will have some level of hydrophobic effect. We then have the question of, is it meeting the requirement of what the claim construction was? And then secondarily, let me point out that Maier was solving a very different problem than what's talked about in the Karamuk patent. The Maier cover element is being coated so that there's not water penetrating through the cover element itself. This is a mesh-like thing. You have to allow acoustic ingress, so it's porous, and you're putting this hydrophobic substance on there to prevent water from penetrating into the microphone. The Karamuk patent, in comparison, is solving a very different problem. It's talking about putting a hydrophobic coating on different structural elements of a housing, and we're going to get to it's a different thing you're coating in Karamuk, but to prevent the water from rolling off and penetrating crevices between two structural components. Why are the crevices materially different from pores? First of all, because that's what the claim says. The claim says we're talking about crevices in the... I understand that, but the crevices are basically gaps in the surface of the object, and you don't want water going through the gaps. Teflon will impede the water from going through gaps. I think we all understand that. Why are the gaps in Meyer different materially from the gaps, i.e. crevices, in the patent? Because what we're doing here, and this was the whole point of the Karamuk patent, you're not putting a hydrophobic coating over the gaps, over the crevices. No. You're simply individually coating the components  Individually, if we get a sufficient hydrophobicity of those components, the water won't roll into the crevices, whereas with Meyer's cover element, you're preventing it from going through that. The Meyer cover element is going to have gaps on the side. They're not trying to solve that problem. They're simply solving the problem of going through the pores to the speaker that's below, not worrying about water rolling off the side to the crevices between structural components. That's what we're talking about here in this claim. It's talking about crevices, chinks, capillaries, etc., that occur due to an assembly of at least two structural components. We're putting hydrophobic coating on housing walls on both sides of a crevice between two different structural components, and doing that prevents water from rolling into the crevices and penetrating the device. Again, Meyer's solving a different problem where we have this mesh cover over a speaker and getting sufficient hydrophobicity to go through that. And you're saying, are you saying that in Meyer, the Teflon coating is a solid coat of Teflon over the mesh? I think it's described as a permeable, thin layer of Teflon over the mesh. Permeable by what, air? Again, I'm just reading what's the quote from Meyer. That's all that's there. Well, that doesn't necessarily suggest that it's... What's bothering me is that obviously in Meyer, the mesh, the pores, are there in order to permit the acoustic passage to the innards of the machine. That wouldn't be possible if you have a solid sheet of Teflon on top of the mesh. Absolutely. So that doesn't sound like a description of what Meyer is really trying to do. So again, Meyer is saying, put enough hydrophobic coating on this mesh over the speaker to prevent water from going through. Again, I think it's solving a very different problem. But the petitioner's expert said that Meyer was solving this problem. So why isn't that substantial evidence to support what the board did? First of all, I don't think the petitioner's expert mentioned the 90-degree contact angle or attempted to present any evidence with respect to the board's claim construction at all. On the crevices, the petitioner's expert spoke to that, right? Yeah. They absolutely spoke to the crevices and whether water would penetrate. And on that, there's certainly evidence. I think it's conclusory expert testimony, which this court in TQ Delta v. Cisco suggests isn't sufficient to provide substantial evidence. But then there's also the evidence of our expert, and this was Appendix 1865-70, where he went through in detail, both saying this is not going to prevent the water from penetrating the crevices as opposed to the cover element. And then secondly, pointing out the common sense point, that the whole point here is to put it on the housing walls on both sides of a crevice. But they didn't credit that. They credited the petitioner's expert. Right. Credited the conclusory testimony of their expert. If we don't think it's conclusory, they were free to credit it, correct? Fair enough, although there's also case law from this court that suggests when there's contrary evidence, it needs to at least be acknowledged. And they basically said it was unrebutted, basically ignoring what our expert said. I guess the final point I want to make is, this claim is short, doesn't have a lot, but the one place that the hydrophobic coating must be applied in the claim is to the housing wall of one of these devices. And the evidence in the record is clear that in Meyer, they're not putting a hydrophobic coating on the housing wall of that device. The housing wall is called out by petitioner's own expert. They're putting it on the cover element, which is part of Meyer's housing wall, isn't it? I don't think it's part of Meyer's housing wall at all. And, in fact, their own expert, Appendix 595-91, talks about the cover element as a removable, separate component from the housing. Your friend says that you argued it was part of the housing wall at 355 to 356. Are they wrong about that? I think they're absolutely wrong about that. And, again, this was actually something adopted by the board in the final written decision, Appendix 18. Meyer describes the coated cover element and the hearing aid housing as two individual components of the hearing aid, where the coated cover element is a removable and separate component. Housing wall is a structural component. This is a separate, optional, removable component. That's the only thing where the hydrophobic coating is put on the Meyer device, and the claim specifically requires it has to be put on the housing, which is two separate structural components of the housing. And so they do not meet that requirement of the claim language, and the board just missed on that. There's no suggestion that the coated cover element becomes a permanent, structural form of this housing wall, and so we think that's another error that requires vacational reversal of the decision. Okay, you're into your rebuttal time. Do you want to say that? I will reserve the rein. Thank you. We'll give you two minutes. Mrs. Nowell? Good morning, Your Honor. Catherine Nowell from Med-El. May it please the Court. This is a straightforward case. The board rightly found that Meyer anticipates each and every element of Claim 1 of the 847 patent after carefully reviewing the extensive evidence provided during the IPR proceeding. Before you get into the guts of your argument, let me see if I understand what's going on in Meyer. Your opposing counsel has suggested that Meyer has, as I understand it, a coat of Teflon all the way across the mesh area, as opposed to what I had understood, maybe incorrectly, to be a coating on the solid parts of the mesh, but not covering the pores in the mesh. What do you understand from Meyer? Well, first of all, I'd like to clarify that Stanova is mischaracterizing the disclosure in Meyer. There's nowhere that it says it's a mesh-like coating. The cover element is described as a porous material that allows the acoustic signals to come in, but it also prevents water from also entering, and it also allows the cover element is disclosed. Well, whether you call it mesh or porous, but in any event, it has pores. We know that. Correct. Pores are a little different than mesh. Okay.  Well, let's start with pores then. Does the Teflon cover up the pores, or is it simply positioned so it is around the pores, so that the pores are free to reach the air, but the Teflon is on the surfaces surrounding the pores, so that water is prevented, or at least impeded, from going into the pores? Yes. That's our understanding as well, because Meyer does disclose that the acoustic signals are still able to come through, even with the cover element coated with the hydrophobic coating, and it prevents the water from penetrating into the hearing aid housing, the crevices in the electronics in the housing. So that is our understanding as well. Let's do one related question. I had understood the preferred embodiment in Meyer was porous, but your expert said there were also non-porous embodiments, or that one of skill in the art would read into it, non-porous embodiments. Correct. And our expert said that in conjunction with the cover element that's disclosed to cover the vents, so Meyer discloses cover elements that cover the acoustic input apertures, the acoustic output apertures, and also vents. And part of that is because these hearing aid devices typically have batteries, usually zinc-air batteries that need air to be able to come in in order to function properly, so the cover element needs to cover that vent, but still allow the air to come into the housing. The substantial evidence supports the board's factual findings that Meyer discloses a hydrophobic coating, as that term has been construed, discloses a hydrophobic coating on the housing wall, and discloses providing a hydrophobic coating to prevent moisture from entering crevices formed between the assembly of at least two structural components. Given the claim construction, which the board adopted, we do have to read the claims as being limited to the term as defined in the claim construction, right? So the 90 degree or greater contact angle is something we do have to find in Meyer in order to invalidate the claims, right? Well, I would suggest that the claim, the 847 patent claim requires providing a hydrophobic coating. And the term hydrophobic has been construed to mean, by definition, resistance to water that exceeds the 90 degree contact angle. But that's not an additional limitation required in the claim. But for all practical purposes, we have to find a 90 degree or greater contact angle because that's how the claims have been construed, and we have no appeal of that construction. I believe what needs to be found is the word hydrophobic. The construction that hydrophobic means to one of ordinary skill in the art, having resistance to water with greater than 90 degree contact angle is what it's defined to mean. But Claim 1 in Kermack doesn't say providing a hydrophobic coating with a contact angle of greater than 90 degrees. It requires providing a hydrophobic... We know that's what the claims mean because... I think that's the definition of the word hydrophobic. So I believe what needs to be shown in the prior art is that we have a hydrophobic coating as that term has been defined and construed to mean. Which is a greater than 90 degree contact angle. I agree. Myers-Jones? Go ahead. I'm sorry. Do you think that in talking about the contact angle, the board was referring to the contact angle that's present in the particular application or more generally that Teflon is a hydrophobic substance in general because in general it creates or experiences a contact angle of greater than 90 degrees? It seems odd to say that Teflon in one circumstance could be deemed hydrophobic, a hydrophobic substance, and in another context, not hydrophobic. It's a hydrophobic substance, right? And it's a hydrophobic substance because, at least in general, it has this high resistance to water. Correct. What is it that the board really means when it says that it has to meet this angle requirement? Well, I think the board carefully construed or analyzed the evidence of the record and found that the Teflon is a known material that is hydrophobic and is known to have a contact angle of greater than 90 degrees. It's sufficient you don't have to actually measure the angle. I'm sorry. It's that sufficient that it's known as a hydrophobic material and you don't have to, in individual cases, go and measure the particular Teflon coating to determine whether it meets the 90 degree angle. I think that's correct. One of ordinary skill in the art understands that Teflon is a known hydrophobic coating and it's known to have a contact angle of greater than 90 degrees. But you still have to deal with the 90 degree requirement. And to follow up on Judge Dyke's question, are you suggesting that in an individual case, if you had a showing that the contact angle was less than 90 degrees, you would have no infringement? Because you would say, even though it's Teflon, it's not hydrophobic. Do you think that's the implication of what the board is saying when it says the construction, proper construction, is more than 90 degrees? I think the board is trying to determine what would one of ordinary skill in the art understand the word hydrophobic to mean. And I think the board determined that Teflon is a known hydrophobic coating and it's known to have a contact angle of greater than 90 degrees. So one of ordinary skill in the art would understand when Meyer discloses Teflon is an exemplary hydrophobic coating, they would know that that is a known coating that has a contact angle of greater than 90 degrees. Just about the crevices argument, as I understand it, the board found it necessary to consider your expert's testimony in order to conclude that one of skill in the art would read into Meyer the disclosure of the crevices limitation. But in doing that, the board said that your expert's testimony was unrebutted. But that appears to be a mistake. Can you help me with that? I think the board carefully construed the evidence in front of it and determined that... Medow's construction was more plausible. I'm not talking about clay construction. Medow's interpretation that what Meyer discloses to one of ordinary skill in the art is that water is prevented from entering both the pores in the cover element as well as the crevices formed between the junction of the cover element and the rest of the housing. But in doing that, the board is clearly relying on your expert and your expert's testimony about what Meyer is doing. Correct? Correct. The board did credit Dr. Jackman's testimony. And says that that testimony is unrebutted. I think that's at 831. Yes, correct. That is 31. Correct. But we're told on appeal, and it looks like they're right, that they did dispute that and maybe even presented contrary expert testimony. Are they wrong about that? Was it correct that it was unrebutted, or is that a mistake? I think even when there's two opposing views, the board can carefully analyze what... That's true. Go ahead. Again, I'm just really asking the same question that just started, which is, is it the case that there was some rebuttal evidence? I think Sanova's position was that what Meyer discloses was only preventing water from entering into the pores. And Meddow and our expert offered that it was the disclosure in Meyer, one of ordinary skill in the art, would understand that water is prevented from entering both the pores and the cover element as well as the crevices formed between the cover element and the rest of the housing. And the board considered all of that evidence and found that Sanova's position was just not a reasonable position. Sanova cites us to pages 1865 to 1870, which appears to be one of their experts' reports. And they say that that's directly responsive and rebutting the testimony from your expert that the board relied on and called unrebutted. So again, I think Judge Bryson and I are both searching for maybe two answers. Do you agree that it was rebutted? And if so, how do we know that the board considered both sides when they mistakenly told us it was unrebutted? I think that Sanova did offer into evidence that it was only the pores and the cover element that Meyer is disclosing when he talks about preventing water. But I think a reasonable interpretation when Meyer discloses that water is prevented from entering the hearing aid housing that Meyer is disclosing to one of ordinary skill in the art that we're talking about both the pores and the cover element as well as the crevices formed between the cover element and the housing. And I believe the board considered the evidence, all the evidence of record, and found that it was a more plausible explanation, the evidence that Meddow had put forth. Didn't they describe the patent owner's expert testimony? I'm sorry, what? Didn't the board describe the patent owner's expert testimony? The board... The question is whether it overlooked the testimony. I don't think the board overlooked the testimony. It described the testimony. I think the board went through a very careful analysis. No, no, my question is the board described their expert's testimony when it summarized the parties' positions. No? The board did summarize both parties' positions as well as... Okay, so it didn't overlook the testimony. They did not overlook the testimony, correct, Your Honor. So even if it made a mistake and characterized it as unrebutted, it's basically harmless there. It wasn't unaware of the testimony. Correct. It didn't fail to consider it. Right. The board did not ignore the testimony that Sanova and its expert had put forth. It just found that it was more reasonable to interpret what one of ordinary skill in the art would understand Meyer to disclose, that in looking at all the evidence that Meyer does disclose, that the preventing a hydrophobic coating prevents water moisture from entering into the crevices. I don't think you've had a chance to address the housing wall versus cover element issue. Do you agree that Sanova did put that limitation in dispute below? I believe there are several points I want to make on that. Our expert actually did specifically testify that, and this is in Appendix 596, Paragraph 60, that, quote, Meyer teaches combining the hydrophobic coating of a cover element that forms part of the housing wall of the hearing aid. So there was testimony on the record that we considered the cover element to be a part of the housing wall. What about A18 that your friend pointed out to us where it appears you argued that they were separate? Right. That was in conjunction with the other part of the claim element requirement because the claim in Karamuk requires that the crevices occur due to an assembly of at least two structural components of the hearing aid device. So we were talking about that in conjunction with talking about two separate components. So the cover is separate from the housing wall, or it's part of the housing wall? It is separate until it's attached to the housing. And at that point, Meyer even discloses that it becomes integrated into the housing. So Meyer discloses that the cover element does, in fact, become. And I would like to dispute Sanova did argue earlier in their briefs, in the patent owner's response at appendix 355 to 356, and it was in their footnote, in conjunction with talking about the cover element being a part of the housing wall, they said, quote, even if the interior sides are coated, the coating is still applied only to a portion of one surface that forms the crevice while the other portions are not coated. The 847 claim requires the crevice is formed in a wall of the housing. So they were absolutely arguing at that point that the cover element was part of the housing. What was being disputed at the time was that there were not coatings on both sides of crevice. And as we had articulated to the board, that was not in fact a requirement of the claim. The claim simply just requires that the coating is at least in the area of the one or more crevices. Okay. Unless you have any further questions. Thank you. We asked the board to affirm. Thank you. Mr. Cernal, you have two minutes. Very quickly on that last point at appendix 355, 356, our argument was always it's not on the housing wall. And then secondarily, what the council was pointing to is pointing out the additional point, which is it's only on one side of the crevice. So it's not really accomplishing the function that's called out of the claim, which is preventing moisture penetration into the crevice. With respect to Judge Stark's question regarding the porosity of a cover element, I agree that their expert did start to talk about, well, maybe you could have non-porous cover elements. But Meyer's very clear, this is appendix 59, column 3, 18, 19, says materials used for the cover element are porous. It seems like a very clear teaching and there's no suggestion that they're going to go beyond that. In terms of this question of finding the word hydrophobic and what does it mean? And again, council argument I think was consistent with what the board did, which was basically, if I see hydrophobic, I just assume 90 degrees. There's actually evidence in the record, appendix 350, that talks about the word hydrophobic being used in the art to refer to things down to 80 degrees, down to 65 degrees. And so, we can't just assume, we see hydrophobic, we can immediately conclude 90 degrees. Secondly, when they read in... The patent says that Teflon is hydrophobic. A slab of Teflon will be hydrophobic, above 90 degrees, absolutely. But then when we look at... What's the... Does it say a slab of Teflon? It says Teflon. Yeah. Teflon, not a coat, Teflon coating, Teflon. That's the substrate and the surface. When we have a surface treatment being applied to a substrate, that's a different question. The only place where we had any... The 90 degree being read in inherently, was from Koenigsberg. And Koenigsberg cautions and says, this is a function both of the surface treatment, as well as the substrate to which it's applied. And we pointed out Koenigsberg in our blue brief, spent pages discussing pointing this out, and their red brief didn't come back and respond to it at all. Not a single word about Koenigsberg, pointing out this is a much more sophisticated thing than simply word matching, finding hydrophobic, and being done. Was the board's error in calling their expert's testimony unrebutted on the crevices point, was it harmless? Absolutely not. How was it harming you? Because there was testimony there that pointed out that there would be water penetration, that Meijer doesn't meet that requirement, Dr. Young pointed that out. But the board was clearly aware of your expert's analysis and referenced it throughout the opinion. Certainly didn't consider that because it wouldn't have characterized the testimony of their expert as unrebutted if it had analyzed the 1865... The term unrebutted could have two meanings. One is it was... There was no answer given. And the other is that it wasn't rebutted because the answer given, whatever it was worth, was not sufficient to persuade us otherwise. I wonder which of those two meanings of unrebutted... I think it's a mistake and missed and didn't acknowledge it being there. And it's very easy to say I've looked at both experts and I agree with petitioner's expert over the countervailing opinion. That's not what was said. Okay. Thank you. Thank you. Thank you so much. Thank you. There was no case to submit.